# UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MONTANA

| | |
|---|---|
| In re | |
| **SPANISH PEAKS HOLDINGS II LLC**, | Case No. **12-60041-7** |
| Debtor. | |
| In re | |
| **SPANISH PEAKS LODGE LLC, and** | Case No. **12-60042-7** |
| Debtor. | |
| In re | |
| **THE CLUB AT SPANISH PEAKS LLC**, | Case No. **12-60043-7** |
| Debtor. | |

# MEMORANDUM of DECISION

At Butte in said District this 10th day of March, 2014.

In the above-referenced Chapter 7 bankruptcy cases, after due notice, a hearing was held November 12 and 13, 2013, in Billings on several matters.  This Memorandum of Decision addresses:

(1)   The Trustee's Motion for Approval of Debtor-Affiliates Settlement filed October 25, 2013, at docket entry no. 756, and the Trustee's proposal to distribute $504,050.00 from the KeyBank litigation settlement proceeds, which would otherwise be going to the Debtor-Affiliates, to Spanish Peaks Holdings II, LLC and to distribute $88,950.00 to The Club at Spanish Peaks, LLC, together with the objections thereto by Boyne USA, Inc., Big Sky Resort LLC, First American Title Insurance Company, CH SP Acquisition, LLC, and The Spanish Peaks Ad Hoc Members Group, Inc.; and

1

    (2)      CH SP Acquisition, LLC's Motion for Determination that the Debtors' Assets are Sold Free of Insider Leases filed September 27, 2013, at docket entry no. 727, together with the objection thereto filed collectively by Resort Capital Partners SP1, LLC, Spanish Peaks Development, LLC, Pinnacle Restaurant at Big Sky, LLC, Montana Opticom, LLC and related affiliates.

The Chapter 7 Trustee, Ross Richardson, was represented at the hearing by John Amsden of Bozeman, Montana; CH SP Acquisition, LLC was represented at the hearing by James F. Wallack of Boston, Massachusetts and Steven M. Johnson of Great Falls, Montana; Obsidian Partners II, LP, 1776 Holdings, LLC, 1776 Holdings, LLC dba Voyager Group Management Services, American Land Development, LLC, Resort Capital Partners SP1, LLC, James J. Dolan, Pinnacle Restaurant at Big Sky, LLC, Spanish Peaks Provisioners, LLC, Ascent Data, LLC, Voyager Properties, LLC, RCP 1, LP, Spanish Peaks Development LLC, Pinnacle Provisioners, LLC, Voyager Lending Services LLC, Voyager Group LP, Voyager Properties II, LLC, and Montana Opticom, LLC (collectively the "Debtor-Affiliates") were represented at the hearing by Michael J. Roeschenthaler, Brad A. Funari and Scott E. Schuster of Pittsburgh, Pennsylvania, and Malcolm H. Goodrich of Billings, Montana; Boyne USA, Inc. and Big Sky Resort, LLC were represented at the hearing by Michael R. Lastowski of Wilmington, Delaware and James A. Patten of Billings, Montana; and First American Title Insurance Company was represented at the hearing by Trent Gardner of Bozeman, Montana.  Stephan Garden, Ross Richardson, Taylor Middleton and Mark Bradford testified; CH SP Acquisition, LLC's Exhibits 1 through 8, and Boyne USA, Inc.'s Exhibits 1 through 4, were admitted into evidence without objection.  At the conclusion of the hearing, the Court took the matters under advisement.  In reaching the findings and conclusions set forth in this Memorandum of Decision, the Court has considered and weighed all the evidence, testimony, admitted exhibits, arguments of counsel, and pleadings and

briefs filed by all parties with respect to the two matters identified above, even though the Court may not specifically refer to them in this Memorandum of Decision.

## BACKGROUND

James J. Dolan, through a trio of companies, namely Spanish Peaks Holdings II, LLC, Spanish Peaks Lodge, LLC and The Club at Spanish Peaks, LLC, sought to develop a private 5,700 acre, high-end, residential ski and golf resort in Big Sky, Montana known as "Spanish Peaks Resorts" or "The Club at Spanish Peaks." The development included an 18-hole Tom Weiskopf designed golf course and ski in/ski out access to local ski facilities.

**I.     The Citigroup Loan**

On or about November 30, 2006, Spanish Peaks Holdings, LLC and Citigroup Global Markets Realty Corp. ("Citigroup") entered into a Loan Agreement ("Original Loan Agreement") and certain other loan documents pursuant to which Spanish Peaks Holdings, LLC obtained from Citigroup a loan in the original amount of $130,000,000.00. The Original Loan Agreement was secured by, *inter alia*, a Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing that were recorded in Madison and Gallatin Counties, Montana on November 30, 2006 (the "Original Mortgage").

After Spanish Peaks Holdings, LLC defaulted on various obligations under the Original Loan Documents, Spanish Peaks Holdings II, LLC, as borrower and as the successor by merger to Spanish Peaks Holdings, LLC, and Citigroup, as lender, entered into, on March 16, 2010, an Amended and Restated Loan Agreement. The Amended and Restated Loan Agreement had an effective date of March 25, 2010, and amended, restated, and restructured the Original Loan of $130,000,000.00, and split it into two loans: a Senior Mortgage Loan of $57,800,00.00 and a

Subordinate Mortgage Loan of $60,204,995.73.  As set forth in the Amended and Restated Loan

Agreement, Spanish Peaks Holdings II, LLC and Citigroup agreed and acknowledged that:

> [T]he Original Loan Agreement and the "Loan Documents", as defined in the
> Original Loan Agreement, remain in full force and effect, binding on and
> enforceable against the Borrower, except as amended and restated by this
> Agreement and the other Loan Documents, (ii) agree and acknowledge that
> nothing in this Agreement or the other Loan Documents shall constitute a
> novation of the Original Loan, the Original Loan Agreement and the "Loan
> Documents", as defined in the Original Loan Agreement, (iii) ratify and reaffirm
> all of the terms, covenants and conditions of the "Loan Documents", as defined in
> the Original Loan Agreement, to which they are a party and their respective
> obligations thereunder, except as amended and restated by this Agreement and the
> other Loan Documents; and (iv) agree and acknowledge that all liens, pledges,
> assignments and security interests made, granted or contemplated by the "Loan
> Documents", as defined in the Original Loan Agreement, remain in full force and
> effect, have been validly created and perfected and are binding on and enforceable
> against the Borrower, except as amended and restated by this Agreement, the
> other Loan Documents and the Mutual Release Agreement described in Section
> 2.1(b) above.

An Amended and Restated Mortgage, Assignment of Leases and Rents, Security Agreement and

Fixture Filing were filed in Gallatin and Madison Counties, Montana on March 25, 2010.

By early 2012, the Citigroup Loan had been transferred and assigned to Spanish Peaks

Acquisition Partners, LLC ("SPAP").  Pursuant to Notices filed April 19, 2013, the claims of

SPAP in the amounts of $122,193,957.93 and $288,000.00 were transferred to CH SP

Acquisition, LLC.

## II.    The Leases

After securing the Original Loan, but prior to March 16, 2010, when Spanish Peaks

Holdings, LLC, and Citigroup entered into the Amended and Restated Loan Agreement, Spanish

Peaks Holdings, LLC, as lessor, and Spanish Peaks Development, LLC, as lessee, both of 90

Beta Drive, Pittsburgh, Pennsylvania, entered into a lease whereby Spanish Peaks Development,

4

LLC leased from Spanish Peaks Holdings, LLC real property in Madison County, Montana commonly referred to as The Pinnacle at Big Sky Restaurant.[1]  The lease provided that Spanish Peaks Development, LLC would pay Spanish Peaks Holdings, LLC the sum of $1,000.00 per month through November 30, 2007, and Spanish Peaks Holdings, LLC, the lessor, was responsible for paying all real property taxes pertaining to the property, all personal property taxes for its personal property located at the property, for maintaining and repairing all parts and portions of the property, and for paying all janitor, garbage, heat, light, water, sewer, telephone and other utility services as the lessee might require.  Commencing December 1, 2007, the monthly lease payments would increase by a defined  percentage.  The lease was signed by James J. Dolan as Manager of both Spanish Peaks Development, LLC and Spanish Peaks Holdings, LLC.

Pursuant to a Ground Lease with an effective date of December 14, 2007, Spanish Peaks Development, LLC and Spanish Peaks Holdings, LLC terminated the December 2, 2006, lease and replaced it with a Ground Lease ("Pinnacle Restaurant Lease").  The Pinnacle Restaurant Lease had an initial term of 99 years, and a rental rate of $1,000.00 per year.  Also under the Pinnacle Restaurant Lease, the lessee, Spanish Peaks Development, LLC, was responsible for paying all real and personal property taxes, and for paying all utilities and services when due, and was required to maintain the Leased Premises in a clean and orderly condition.  The Pinnacle Restaurant Lease includes "all access rights, utility rights, and contracts pertaining to the Leased

---

[1]  The property that is the subject of the lease is described in Exhibit A attached to the Lease as "The Pinnacle at Big Sky Restaurant - Top of Andesite Mountain, Big Sky Resort, Montana - South ½ of NE ¼ & E ½ of NE ¼ of NE ¼ & SE ¼ SEC 31 Exc. All Yellowstone Mountain Club Sub, Madison County, Montana.

Premises" and included but was not limited to "all property leased under the terms of the 2006 Lease." The term "Leased Premises" in the Pinnacle Restaurant Lease "does not include any improvements now or at any time during the term of this Lease located on the land, even if such improvements may for some purpose be construed as constituting part of the real property." The Pinnacle Restaurant Lease also provides that: "All improvements constructed on the Premises by [the lessee, Spanish Peaks Development, LLC] shall be owned by [the lessee, Spanish Peaks Development, LLC]" and that "any permanent improvements described in [the Pinnacle Restaurant Lease] shall become a part of the Leased Premises and shall become and remain [the lessor's (Spanish Peaks Holdings, LLC's)] property." Finally, the Pinnacle Restaurant Lease provides that if Spanish Peaks Development, LLC "deserts or vacates the Leased Premises . . . and . . . fails to remedy such default within 30 days after [the lessor (Spanish Peaks Holdings, LLC)] provides written notice of such default . . . then [the lessor (Spanish Peaks Holdings, LLC)] shall, at its option, have the right to declare this Lease null and void[.]"

Taylor Middleton, the General Manager of Big Sky Ski Resort testified that he has been involved with and negotiated approximately fifty leases. Middleton testified that a reasonable rental rate for the Pinnacle Restaurant is somewhere between $40,000 and $100,000 per year.

The Pinnacle Restaurant Lease was signed by Douglas L. Hein as Chief Financial Officer of Spanish Peaks Holdings, LLC and by James J. Dolan as Manager of Spanish Peaks Development, LLC. At the time, James J. Dolan was also the Manager of Spanish Peaks Holdings, LLC. The Pinnacle Restaurant Lease involved establishing a restaurant adjacent to ski slopes at Big Sky Ski Resort. The Pinnacle Restaurant is accessed by ski lifts operated by Boyne USA, Inc. and Big Sky Resort LLC.

6

On December 12, 2008, Spanish Peaks Development, LLC assigned the Pinnacle Restaurant Lease to Pinnacle Restaurant at Big Sky, LLC, and on December 18, 2008, James J. Dolan, as manager for Spanish Peaks Development, LLC and Pinnacle Restaurant at Big Sky, LLC, and Douglas L. Hein, as Chief Financial Officer of Spanish Peaks Holdings, LLC, signed an Abstract of Ground Lease that was filed in Madison County on December 30, 2008.

Finally, Spanish Peaks Holdings, LLC, as lessor, and Montana Opticom, LLC, as lessee, entered into a lease with an effective date of January 1, 2009 ("Opticom Lease"). The Opticom Lease covered real property in Gallatin and Madison Counties, Montana described as "The Andesite Gun Range Towers, The Rock, The Andesite Cell Tower, and the Andesite TV Towers." The Opticom Lease commenced on January 1, 2009, and provides that it shall end at midnight on December 31, 2068. The Opticom Lease contemplates annual rent of $1,285.00 during the term of the lease. The Opticom Lease was signed by Douglas L. Hein as Assistant Manager of Spanish Peaks Holdings, LLC and by James J. Dolan as Manager of Montana Opticom, LLC. At the time, James J. Dolan was the Manager of Spanish Peaks Holdings, LLC. The Opticom Lease provided for the placement of certain telecommunication towers so that members of the Spanish Peaks Resort could have telephone and related telecommunication services. The Opticom Lease was not recorded in either Gallatin County or Madison County.

The Pinnacle Restaurant Lease relates to property located in Madison County, Montana, and the Opticom Lease relates to property located in Madison and Gallatin Counties, Montana. Pinnacle Restaurant at Big Sky, LLC has not operated the Pinnacle Restaurant since April of 2011, but the Debtor-Affiliates argue they have not defaulted on either of the Leases and in fact, continue to incur obligations and make payments relating to the same, including, but not limited

7

to, payment of real estate taxes.  Pinnacle Restaurant at Big Sky, LLC and Montana Opticom, LLC also argue that they are continuing to maintain the leased property.  Mark Bradford, the Director of Grounds Operations for American Land Development, LLC testified that he visits the Pinnacle Restaurant site two times per month to check propane levels and to make sure there are no broken windows or that a chimney has not fallen over.  Bradford also visits the premises twice a year to inspect the fire suppression system, the plumbing, boilers, etc.

### III.    Bankruptcy and the Sale of Substantially All The Debtors' Assets

Facing numerous lawsuits and a troubled real estate market, the Debtors, on October 14, 2011, commenced the above-captioned cases in the United States Bankruptcy Court for the District of Delaware under Chapter 7 of the Bankruptcy Code.  The petitions were signed on behalf of the Debtors by their Chief Financial Officer, Douglas L. Hein.  The Board of Managers for Spanish Peaks Holdings II, LLC consisted of James J. Dolan, W. Dean Genge and Douglas L. Hein; and James J. Dolan was disclosed as the sole Manager for Spanish Peaks Lodge, LLC and The Club at Spanish Peaks, LLC.  Spanish Peaks Development, LLC was disclosed as the only entity owning directly or indirectly 10% or more of any class of equity interests in Spanish Peaks Holdings II, LLC; and Spanish Peaks Holdings II, LLC was disclosed as the only entity owning directly or indirectly 10% or more of any class of equity interests in Spanish Peaks Lodge, LLC and The Club at Spanish Peaks, LLC.  James J. Dolan was disclosed as the "CEO & Manager" of Spanish Peaks Holdings II, LLC.

In the Statement of Financial Affairs filed on behalf of Spanish Peaks Holdings II, LLC, the Debtors disclosed eleven pending lawsuits:  *Byrne v. Whiting-Turner, et al*; *Spanish Peaks Holdings v. Boyne USA*; *Harbaugh et al v. Spanish Peaks et al*; *Hogan Corporation Services v.*

*Spanish Peaks Lodge LLC*; *Spanish Peaks Lodge, LLC, et al v. KeyBank, et al*; *Spanish Peaks Holdings II, LLC, Successor to Spanish Peaks Holdings, LLC v. KeyBank, et al*; *JIM-N-1 Inc. dba Allied Steel v. Spanish Peaks Holdings, LLC*; *Cincinnati Insurance Co. v. Spanish Peaks Holdings, et al*; *Foster & Karol v. Spanish Peaks Holdings, et al*; *First American Title Company v. Spanish Peaks Holdings*; and *Malcolm Drilling Company, Inc. v. Spanish Peaks Holdings II, LLC.* Spanish Peaks Holdings II, LLC's Schedule A disclosed that it owned approximately sixteen parcels of real property located in Gallatin County, Montana and Madison County, Montana.

Pursuant to a Memorandum Order entered by United States Bankruptcy Judge Brenden Linehan Shannon on January 10, 2012, the Debtors' bankruptcy cases were transferred from the District of Delaware to the District of Montana. On January 17, 2012, Ross P. Richardson was appointed the Montana Chapter 7 Trustee. After notice and hearing, the Court entered an Order on February 8, 2012, directing that the above-captioned bankruptcy cases would be jointly administered.

In late 2012, the Trustee, with the agreement of the prepetition senior lender, SPAP, employed Eastdil Secured, LLC to market the Debtors' property, identify prospective cash buyers, qualify bidders, negotiate the highest offer, facilitate buyer due diligence, conduct an auction and provide testimony at any hearing held in connection therewith. In conjunction with employing Eastdil Secured, LLC, the Trustee also entered into a Stipulation and Term Sheet with SPAP providing for the liquidation of substantially all of the Debtors' real and personal property. *See* docket no. 238. The Trustee and SPAP recognized in the Stipulation that SPAP could likely obtain relief from the automatic stay, if it so desired. The Stipulation provided, in part, that

9

SPAP would "waive any and all of its unsecured claim against the Estates, including any

deficiency claim[,]" and further provided that SPAP would:

> [P]ay at closing a "carve out" from the proceeds of sale of the Property, whether
> by cash sale or credit bid, of $750,000 for distribution as provided under
> applicable provisions of the Code to the creditors of Holdings and Club. In the
> event of a cash sale of the Property exceeds $20,000,000, SPAP will also pay the
> Trustee 2% of the net proceeds of sale. SPAP retains the right to credit bid for the
> Property in accordance with 11 U.S.C. § 363(k); provided, however, SPAP has
> agreed not to submit a credit bid in excess of $20,000,000.

The Trustee's proposed sales procedure order, attached as Exhibit D to the Term Sheet, provided

that the Trustee intended to sell substantially all of the Debtors' property pursuant to 11 U.S.C. §

363 and also provided:

### Sale Free and Clear of Liens, Claims, Interests and Encumbrances

> Pursuant to Section 363(f) of the Bankruptcy Code, all of the Debtors'
> right, title and interest in and to the Property will be transferred free and clear of
> all liens, claims, encumbrances and other interests in the Property other than the
> Permitted Encumbrances set forth in Exhibit D. . .  Any other perfected,
> enforceable, valid liens, claims, interests and encumbrances (if any) will be
> discharged by the order approving the sale and attach to the sale proceeds subject
> to adjudication of the validity and priority of any such liens, claims, interests or
> encumbrances by a court of competent jurisdiction.

The attached Exhibit D, Permitted Encumbrances, identified as permitted encumbrances: "(a)

Reservations and exceptions in any patent from the United States or the State of Montana; (b)

Existing easements and rights of way; (c) All building, use, zoning, sanitary and environmental

restrictions; (d) Taxes and assessments for the calendar year Closing occurs; and (e) Other

encumbrances acceptable to the Successful Bidder in its sole discretion."

Prior to approval of the Stipulation and Term Sheet between the Trustee and SPAP, but

consistent with the Stipulation and Term Sheet, the Trustee filed on January 15, 2013, a motion

pursuant to 11 U.S.C. §§ 105(a), 363(b) and 363(f) seeking first, entry of an order approving the Trustee's bid procedures and second, following a subsequent hearing, entry of a sales order. *See* docket no. 281. The identified Permitted Encumbrances were the same as previously identified by the Trustee in Exhibit D attached to the Term Sheet. On February 22, 2013, the Debtor-Affiliates filed opposition to the Trustee's January 15, 2013, motion, in part arguing that if the Trustee rejected the Debtor-Affiliates' leases, the Debtor-Affiliates would nevertheless elect to "retain [their] rights, including [their] rights to remain in possession of the nonresidential real property that is the subject of the Leases, for the balance of the term of the Leases and for any renewal or extension of such rights that are provided for in the Leases." The Debtor-Affiliates subsequently entered into a stipulation with the Trustee agreeing that the Court could approve the Trustee's bid procedures, but reserving the Debtor-Affiliates' objections, including the § 365(h) objection, as it would relate to any sale order.

While the foregoing matters were pending, but prior to any hearing, Big Sky Resort LLC and Boyne USA, Inc. filed on February 8, 2013, a notice indicating that the Trustee had failed to assume or reject a Ground Lease between Spanish Peaks Holdings II, LLC [successor by merger to Spanish Peaks Holdings, LLC], as lessor, and Big Sky Resort LLC and Boyne USA, Inc., as lessees, and that Big Sky Resort LLC and Boyne USA, Inc. were electing to retain their "rights under the Ground Lease, including, but not limited to, its 'right of use, possession [and] quiet enjoyment' of the leasehold premises for the remainder of the balance of the ninety-nine (99) year term of the Ground Lease and any and all remaining ninety (90) year renewals provided by the Ground Lease." In response, the Trustee filed a motion on March 20, 2013, seeking to assume the Ground Lease between Spanish Peaks Holdings II, LLC, and Big Sky Resort LLC

11

and Boyne USA, Inc.[2]  On May 29, 2013, the Court granted the Trustee's motion to assume that ground lease, finding in part that the ground lease was not deemed rejected under the Bankruptcy Code.[3]

Following notice and hearing, the Stipulation and Term Sheet entered into between the Trustee and SPAP were approved on March 5, 2013.  That same date, the Court entered an Order approving the Trustee's proposed bid procedures, subject to various reservations of rights, including those of the Debtor-Affiliates.

On April 26, 2013, at docket no. 492, the Trustee filed a "Notice of 'Highest Offer'" identifying Satterfield SP Acquisition LLC as having the "Highest Offer" in connection with the auction and sale hearing to be held on June 3, 2013.  Attached to the Notice was an Asset Purchase Agreement, and attached thereto was Exhibit G, Assigned Contracts, which identified only the Ground Lease between Big Sky Ridge, LLC and Spanish Peaks Holdings, LLC [subsequently Spanish Peaks Holdings II, LLC, by merger], as lessors, and Boyne USA, Inc. and Big Sky Resort, LLC, as lessees.  On May 31, 2013, the Trustee refiled at docket no. 560-19, Exhibit G to the Asset Purchase Agreement, which again identified the Ground Lease between Big Sky Ridge, LLC and Spanish Peaks Holdings, LLC [subsequently Spanish Peaks Holdings II, LLC, by merger], as lessors, and Boyne USA, Inc. and Big Sky Resort, LLC, as lessees, as the only assumed contract.   Almost twenty months to the day after the Debtors filed their bankruptcy

---

[2]  The Ground Lease involving Big Sky Resort LLC and Boyne USA, Inc. provides the Spanish Peaks Resort with ski in/ski out access to Big Sky Ski Resort.  *See* Memorandum of Decision, docket entry no. 547, p. 11-13.

[3]  The Court's Memorandum of Decision and Order regarding the ground lease with Boyne USA, Inc. and Big Sky Resort, LLC is found at docket nos. 547 and 548.

petitions, the Court entered on June 13, 2013, an "Amended Order Approving Sale of Property Free of Liens, Claims, Interests and Encumbrances" ("Sale Order"). The Sale Order followed an auction held June 3, 2013, and as set forth in the Sale Order, the auction resulted in a highest bid by the senior prepetition lien holder, CH SP Acquisition LLC, in the amount of $26,100,000.00 and a second highest bid by Satterfield SP Acquisition, LLC in the amount of $26,000,000.00. On June 13, 2013, CH SP Acquisition, LLC filed a "Successful Bidder's Notice of Lodging of Ch SP Acquisition LLC Asset Purchase Agreement." Exhibit G, Assigned Contracts, remained unchanged from the prior Exhibit G filed on April 26, 2013. Of the sales proceeds, $24,910,999.00 was applied to the first position secured claim of CH SP Acquisition, LLC, $1,185,511.00 went to the Spanish Peaks Holdings II, LLC Bankruptcy Estate, and $3,490.00 went to The Club at Spanish Peaks, LLC Bankruptcy Estate.

Throughout the sales process, the Trustee did not give a lot of thought to the Pinnacle Restaurant Lease or the Opticom Lease. Stephan Garden ("Garden"), a financial advisor employed by the Trustee, testified that he and the Trustee quickly concluded that the status of the Leases would not significantly impact the price paid for the Debtors' assets. Garden testified that Satterfield SP Acquisition, LLC had indicated that if it ultimately purchased the Debtors' assets that it would deal with the Pinnacle Restaurant Lease and the Opticom Lease post-closing, advising the Trustee that it "really want[ed] the asset, and the Pinnacle Restaurant [was] immaterial[.]"

On July 3, 2013, Resort Capital Partners SP1, LLC, Spanish Peaks Development, LLC, Montana Opticom, LLC and related affiliates filed a motion for clarification of the Sale Order, asking the Court to affirm that Resort Capital Partners SP1, LLC, Spanish Peaks Development,

LLC, Montana Opticom, LLC and related affiliates could avail themselves, by separate motion, to any rights they might have under 11 U.S.C. § 365(h). The Court denied that motion.

On September 12, 2013, the Trustee filed a motion to reject the Pinnacle Restaurant Lease and the Opticom Lease on grounds "the Estates no longer possess the property that is the subject of the Leases. Therefore, the Trustee must reject the leases, pursuant to his authority to do so under 11 U.S.C. § 365(a)." After receiving no timely objection, the Court, on October 1, 2013, granted the Trustee's motion to reject the Pinnacle Restaurant Lease and the Opticom Lease.

## IV.  Claims Against the Debtors

Garden testified that "there's about $200 million of claims that have been filed against" Spanish Peaks Holdings II, LLC. Garden explained that approximately $122 million was attributable to the Citigroup mortgage. Boyne USA, Inc. asserted a claim of $8,816,390.78 in override claims and another $10 million was attributable to deposits paid on yet-to-be-built homes. Garden testified that construction lien claimants represented another large category of claims, which included a $13 million claim asserted by dck Worldwide Holdings, Inc., as assignee of Dick Construction Company. First Interstate Bank filed a claim of $12,120,305.78 and finally, the Debtor-Affiliates have collectively asserted claims totaling roughly $21,013,337.00.

## V.  Estate Claims Against the Debtor-Affiliates

Garden also testified that he and the Trustee, after going through various books and records, concluded that five Debtor-Affiliates received insider preference payments of approximately $571,657.00 from The Club at Spanish Peaks, LLC in the twelve months before

14

the date of the filing of the petition, and that eleven Debtor-Affiliates received insider preference payments of approximately $3,199,576.00 from Spanish Peaks Holdings II, LLC (which included a $1.5 million transfer to Spanish Peaks Development, LLC, $538,000 in wire transfers to American Land Development, and transfers totaling $1,118,353 to various Voyager entities) in the twelve months before the date of the filing of the petition.  As noted above, Spanish Peaks Development, LLC received $1.5 million from Spanish Peaks Holdings II, LLC, but Garden testified that Spanish Peaks Development, LLC "appears to be just a holding company with no assets and significant negative equity book value."

Garden and the Trustee also concluded that approximately $2.2 million of the transfers were for services, including management services, which were provided to the Debtors by the Debtor-Affiliates.  Garden noted that nine payments made to various Voyager entities totaling approximately $900,000, nine payments made to American Land Development totaling approximately $538,000 and ten payments to Ascent totaling approximately $260,000, were all made within five days of the end of any given month.  With respect to the transfers made for services, Garden and the Trustee estimated that the services were billed at rates that were 30 percent over market, leaving the Debtors with a potential claim of approximately $660,000.00. Garden also described a transaction between the Debtors and Ousel Falls, LLC involving the transfer of a partially finished cabin, but did not ascribe any dollar amount to any potential claim associated therewith.

Garden approached the Debtor-Affiliates early on about trying to resolve the alleged fraudulent and preferential transfer claims.  Garden testified that the Debtor-Affiliates "weren't really willing to discuss or even negotiate anything with us initially."  The Trustee eventually

15

drafted, but did not file, a complaint alleging that:  (1) the Debtor-Affiliates were the transferors or transferees of various fraudulent and preferential transfers of the Debtors' assets preceding their filing for bankruptcy protection on October 14, 2011; and (2) James J. Dolan breached his fiduciary duties.  As the Trustee got closer to filing the complaint, Garden testified that the Debtor-Affiliates "came back and started . . . having discussion about a settlement."  Hr'g Tr. (November 12, 2013) 40:2-6.

The Trustee and the Debtor-Affiliates have since reached a settlement regarding the potential claims the Debtors may have against the Debtor-Affiliates.  That settlement is the subject of the pending Trustee's Motion filed on October 25, 2013, at docket no. 756.  Garden testified that the revised damage estimate of $660,000.00, as discussed earlier, is "pretty close to what we had gotten [in the settlement] without having to expend significant capital to either litigate it, hire experts to prove market value of the services, and removing all of the collection risk.  So from our perspective, there is a lot of benefits to having brought the settlement forth." The Trustee's motion sets forth the principal settlement terms, but Garden described the Trustee's settlement with the Debtor-Affiliates as bringing an additional $1 million to the Bankruptcy Estates, with the funds coming from the Debtor-Affiliates' share of the global settlement with KeyBank.[4]  As part of the settlement filed at docket no. 756, the Debtor-

_____

[4] On June 14, 2013, the Trustee filed a motion seeking approval of a settlement agreement by and between the Trustee, on behalf of Spanish Peaks Holdings II, LLC and Spanish Peaks Lodge, LLC, Voyager Investments, L.P., and Voyager Group, L.P. as parties to the first part, and KeyBank National Association and KeyBanc Capital Markets, Inc., as parties of the second part.  The Trustee subsequently withdrew the June 14, 2013, motion and on October 25, 2013, filed another motion seeking approval of a settlement agreement between the aforementioned parties.  That agreement provides in part for the Debtors' bankruptcy estates to receive a distribution of between $260,000 to $407,000, a cancellation of the debt owed by the Debtors to KeyBank (which was in excess of $6.1 million as of October 2011), a mutual release

16

Affiliates have also agreed to release their claims, as reflected in Proof of Claim Nos. 54, 55, 60, 61, 62, 67, 73, 232, 234, 235, 236, 237, 238, 239 and 270 filed in *In re Spanish Peaks Holdings II, LLC* and Proof of Claim Nos. 14 and 18 filed in *In re The Club at Spanish Peaks, LLC*.  The proposed settlement also provides a broad release of claims between the Trustee and the Debtor-Affiliates.

Finally, Garden testified that if the Debtor-Affiliates Settlement is not approved, he would advise the Trustee to proceed with action against the Debtor-Affiliates because a tolling of the statute of limitations is included in the Settlement.  However, Garden would recommend, from "a pure business standpoint," that the Trustee auction off the claims against the Debtor-Affiliates and let someone else, other than the Trustee, see if they could secure and collect more than what is contemplated in the proposed settlement.

### APPLICABLE LAW an DISCUSSION

**I.**    **Trustee's Motion for Approval of Debtor-Affiliates Settlement**

At the conclusion of the hearing on the Debtor-Affiliates Settlement, the Court granted Boyne USA, Inc. and Big Sky Resort LLC until December 4, 2013, to file a post-hearing brief and granted the Trustee until December 18, 2013, to file a post-hearing reply brief.  Boyne USA, Inc. and Big Sky Resort LLC filed their post-hearing brief on December 4, 2013, and the Trustee filed a post-hearing reply brief on December 18, 2013.  Boyne USA, Inc. and Big Sky Resort LLC then filed on December 24, 2013, a "Post-Hearing Reply Brief in Support of Objection of Boyne USA, Inc. and Big Sky Resort LLC to Trustee's Motion for Approval of Debtor-Affiliates

---

and dismissal of the KeyBank litigation, as identified in the Debtors' schedules.  The KeyBank settlement was approved by this Court on November 14, 2013.

Settlement and to Trustee's Proposed Allocation of Settlement Proceeds Among the Estates."
The Trustee then filed an Objection to Boyne USA, Inc. and Big Sky Resort LLC's Post-Hearing
Reply Brief.  The brief filed by Boyne USA, Inc. and Big Sky Resort LLC on December 24, 2013
was not a post-hearing brief authorized by the Court at the conclusion of the hearing.  The
Trustee's Objection is, therefore, well-taken, and thus sustained.  The Post-Hearing Reply Brief
in Support of Objection of Boyne USA, Inc. and Big Sky Resort LLC to Trustee's Motion for
Approval of Debtor-Affiliates Settlement and to Trustee's Proposed Allocation of Settlement
Proceeds Among the Estates filed on December 24, 2013, at docket no. 817 will not be
considered by the Court.

      The Trustee's request for approval of the settlement with the Debtor-Affiliates is, as
previously mentioned, opposed by Boyne USA, Inc., Big Sky Resort LLC, First American Title
Insurance Co., CH SP Acquisition, LLC, and The Spanish Peaks Ad Hoc Members Group, Inc.
Boyne USA, Inc. and Big Sky Resort LLC oppose the settlement arguing the Trustee circulated
on October 10, 2013, for comment and review, a draft complaint wherein the Trustee was
alleging claims in the liquidated amount of $3,771,234.37, along with additional unliquidated
damages against the Debtor-Affiliates.  Just days later and without any discussion, the Trustee
then filed on October 14, 2013, a notice of settlement and then filed the pending motion on
October 25, 2013.  Under the proposed settlement, the Debtor-Affiliates agree to assign $593,000
of the KeyBank litigation settlement to the Debtors' bankruptcy estates, which Boyne USA, Inc.
and Big Sky Resort LLC characterize as "16% of the face amount of the liquidated claims with
no apparent payment for unliquidated claims."  Boyne USA, Inc. and Big Sky Resort LLC also
object to the Trustee's proposed allocation of the settlement proceeds arguing Spanish Peaks

Holdings II, LLC is not receiving sufficient consideration for the claims that the Trustee is releasing. The Spanish Peaks Ad Hoc Members Group, Inc. joins in Boyne USA, Inc. and Big Sky Resort LLC's objection to the Trustee's motion for approval of the Debtor-Affiliates settlement.

CH SP Acquisition, LLC's objection echos Boyne USA, Inc. and Big Sky Resort LLC's objection, and also argues that section 5 of the Insider Settlement is too narrow. CH SP Acquisition, LLC contends that "[a]ny order approving the Insider Settlement should expressly provide that the Insider Settlement is without prejudice to CH SP's rights to bring state law fraudulent transfer claims against Dolan or the Dolan Entities, including Pinnacle and Opticom for the fraudulently transferred leasehold interests, and that such fraudulent transfer claims are not released or extinguished by virtue of the Insider Settlement." First American Title Insurance Co. objects to the Trustee's motion only to the extent that it purports to release claims belonging to First American Title Insurance Co.

Compromises and settlements are governed by Rule 9019(a), F.R.B.P., which provides in pertinent part: "On motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement . . . ." The bankruptcy court is vested with considerable discretion in approving compromise agreements and settlements. *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1988). In *In re Schrock*, 9 Mont. B.R. 414, 416-417 (1991), this Court addressed the test for approving compromise agreements and settlements under Rule 9019(a):

> "Although the bankruptcy court has great latitude in authorizing a compromise, it may only approve a proposal that is 'fair and equitable.'" *Woodson v. Fireman's Fund Ins. Co.*, 839 F.2d 610, 620 (9th Cir. 1988) (Citing *Martin v. Kane (In re A & C Properties)*, 784 F.2d 1377, 1380-81 (9th Cir.) *cert. denied sub nom. Martin v. Robinson*, 479 U.S. 854, 107 S.Ct. 189, 93 L.Ed. 2d 122 (1986). In evaluating a

19

settlement, the Court must consider:

> '(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.' *A & C Properties*, 784 F. 2d at 1381.

*Woodson*, 839 F. 2d at 620 (additional citation omitted).

*See also, In re MGS Marketing*, 111 B.R. 264 (9th Cir. BAP 1990). In addition to the four prong test set forth in *A & C Properties*, it is also well established that the law favors compromise. *In re Blair*, 538 F.2d 849, 851 (9th Cir. 1976). In accordance with that principle, Bankruptcy Rule 9019(a) gives this Court broad authority to approve a compromise or settlement. *In re General Store of Beverly Hills*, 11 B.R. 539, 542 (9th Cir. BAP 1981). The determination of whether to approve a compromise or settlement is a matter within the sound discretion of this Court. *Providers Benefit Life Insurance Co. v. Tidewater Group, Inc.*, 13 B.R. 764, 765 (Bankr. N.D.Ga. 1981). *See also, In re Lions Capital Group*, 49 B.R. 163, 175-76 (Bankr. S.D. N.Y. 1985).

As explained further in *A & C Properties*:

> The purpose of a compromise agreement is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims. The law favors compromise and not litigation for its own sake, and as long as the bankruptcy court amply considered the various factors that determined the reasonableness of the compromise, the court's decision must be affirmed.

*Id*. at 1380-81 (citations omitted). Considering all relevant factors, the Court finds that the Debtor-Affiliate Settlement is "fair and equitable" as required by *In re A&C Properties*. The Court will, therefore, approve the settlement.

Boyne USA, Inc., Big Sky Resort LLC, CH SP Acquisition, LLC and The Spanish Peaks Ad Hoc Members Group, Inc. argue the Trustee is seeking to settle claims in excess of $3,771,234.37 for $593,000.00, without explanation. The Court disagrees. The Trustee

20

maintained, without opposition, that the possible defenses the Debtor-Affiliates could assert against the Trustee's alleged claims would be legally and factually complex. In addition, Garden testified that of the asserted liquidated claims, $1.5 million relate to a transfer to Spanish Peaks Development, LLC. Garden characterized Spanish Peaks Development, LLC as a holding company that has no assets. Both Garden and the Trustee expressed concern about the ability to collect any potential involuntary judgment against Spanish Peaks Development, LLC. Garden testified that he was involved in attempts to collect a judgment from another former ski and golf resort developer, such as James J. Dolan, and that those collection efforts have run in the millions of dollars, all to no avail. The pending settlement poses no collection issue because the funds will be paid to the Bankruptcy Estates by KeyBank. As Garden explained:

> Having the settlement come from KeyBank as opposed to some of the other entities I think removes a lot of the collectability risk. The KeyBank settlement's been approved. I think KeyBank's a pretty solid financial institution, and I don't see a reason why payment wouldn't be received by the Estate.

As to the remainder of the asserted liquidated claims, Garden testified that they relate to services, such as management services, provided by the Debtor-Affiliates. Garden believes the charge for those management services was above-market, but testified that proving such allegations would require large amounts of cash that the Bankruptcy Estates simply do not have.

The Trustee did not allocate the proposed settlement proceeds among the claims asserted in the draft complaint. However, the Trustee has proposed to divide the proceeds from the settlement, if approved, between Spanish Peaks Holdings II, LLC and The Club at Spanish Peaks, LLC, using the asserted liquidated claims. In other words, the Trustee alleged in his complaint that the Debtor-Affiliates received fraudulent or preferential transfers of $3,199,576.39

from Spanish Peaks Holdings II, LLC and received fraudulent or preferential transfers of $571,657.98 from The Club at Spanish Peaks, LLC.  Based on such ratio, the Trustee proposes to distribute $503,111.00 of the Debtor-Affiliate settlement proceeds to Spanish Peaks Holdings II, LLC and allocate $89,889.00 of the Debtor-Affiliate settlement proceeds to The Club at Spanish Peaks, LLC.  The Court finds such allocation fair and equitable.

The Court would also note that Boyne USA, Inc. and Big Sky Resort LLC argue that the Trustee failed to investigate and pursue claims based on the substantially below market Pinnacle Restaurant and Opticom Leases.  As noted earlier, the Trustee has rejected those Leases. The Court sees no benefit to the Bankruptcy Estates of expending scarce resources further investigating the Leases when they have been rejected.   The lease issue is now, as the Trustee points out, a dispute between Pinnacle Restaurant at Big Sky, LLC, Montana Opticom, LLC, and CH SP Acquisition, LLC.

Giving deference to the Trustee's views on the matter, the Court finds that the Debtor-Affiliate settlement is fair, equitable and in the best interest of the creditors.  The Court also finds that the Trustee's proposed allocation of the settlement proceeds is fair and reasonable.

## II.    CH SP Acquisition, LLC's Motion for Determination that the Debtors' Assets are Sold Free of Insider Leases

Finally, CH SP Acquisition, LLC seeks a determination by this Court (a) that the sale of substantially all of the Debtors' assets under 11 U.S.C. § 363 to CH SP Acquisition, LLC was free and clear of the Pinnacle Restaurant Lease and the Opticom Lease, and (b) that 11 U.S.C. § 365(h) does not apply to preserve the Debtor-Affiliates' subordinate and/or voidable leasehold interests following the Sale.  CH SP Acquisition, LLC argues in its Motion that the sale at issue

in this case was free and clear under §§ 363(f)(1), (4) and (5). The Debtor-Affiliates do not dispute that at least one provision of § 363(f) was satisfied. The parties also appear to agree that the term "any interest" as used in § 363(f) includes the Debtor-Affiliates' possessory interest as lessees.

The dispositive issue in this case is thus whether the § 363(f) sale was free and clear of the Debtor-Affiliates' possessory interests. On this point, CH SP Acquisition, LLC argues: (1) based upon the Seventh Circuit Court of Appeal's decision in *Precision Indus., Inc. v. Qualitech Steel SBQ*, LLC, 327 F.3d 537, 544-45 (7th Cir. 2003), the "plain language of section 363 and a uniform reading of the Bankruptcy Code as a whole compel a finding that the Sale transfers the Assets to CH SP free and clear of all interests, including the Dolan Parties' leasehold interests[,]" docket no. 727, p.7, and that § 365(h) is not implicated under the facts of this case; and (2) the Debtor-Affiliates "cannot now look to federal bankruptcy law to create rights that they never bargained for or obtained under state law." *Id.* at 4.

The Debtor-Affiliates disagree, countering that "[t]he clear directive of the seminal caselaw [sic] . . . provides that the Sale cannot be effectuated free and clear of [the Debtor-Affiliates'] section 365(h) rights absent [the Debtor-Affiliates] being allowed to continue to possess its leased premises or alternatively receive some other form of adequate protection." Docket no. 746, p.3. In support of this position, the Debtor-Affiliates cite to cases such as *In re Haskell L.P.,* 321 B.R. 1 (Bankr. D. Mass. 2005), *In re Taylor*, 198 B.R. 142 (Bankr. D.S.C. 1996), and *In re Churchill Props. III, L.P.*, 197 B.R. 283 (Bankr. N.D. Ill. 1996), and urge this Court to "follow the majority position and confirm that a sale pursuant to section 363(f) cannot divest a lessee of its section 365(h) rights." *Id.* at 14. The Debtor-Affiliates also argue that the

23

Pinnacle Restaurant Lease and the Opticom Lease are permitted exceptions under the 2010 Amended and Restated Loan Agreement.

The Trustee takes no position with respect to CH SP Acquisition, LLC's Motion for Determination that the Debtors' Assets are Sold Free of Insider Leases. The Trustee did, however, file on September 12, 2013, a motion to reject said leases, which motion was granted on October 1, 2013.

CH SP Acquisition, LLC, in support of its argument that a sale order under § 363(f) operates to extinguish a lessee's possessory interest, relies extensively on *Precision Industries*. In *Precision Industries*, unrelated parties entered into two agreements. Thereafter, the lessor filed bankruptcy. An auction was held and the debtor's assets were sold pursuant to at least one provision of § 363(f). The debt exceeded the purchase price of the debtor/lessor's assets. The prepetition senior lender was the successful bidder at the auction and purchased the debtor's assets free and clear of all liens and other interests. The prepetition lender subsequently transferred the assets to a newly formed entity. Sometime after the auction, the lessee vacated and padlocked the leased premises. The purchaser of the debtor's assets had the locks changed, which ultimately resulted in the parties seeking a determination from the bankruptcy court as to whether the sale was free and clear of the lessee's possessory interest.

After examining the language of § 363 and § 365(h), the Seventh Circuit Court of Appeals in *Precision Industries* concluded:

> Where estate property under lease is to be sold, section 363 permits the sale to occur free and clear of a lessee's possessory interest — provided that the lessee (upon request) is granted adequate protection for its interest. Where the property is not sold, and the debtor remains in possession thereof but chooses to reject the lease, section 365(h) comes into play and the lessee retains the right to possess the

property.

327 F.3d at 548.

The Debtor-Affiliates criticize *Precision Industries* and, citing *Haskell*, *Taylor*, and *Churchill Properties, III, L.P.*, instead argue that the "majority of cases . . . hold that the provisions of section 365(h) dictate the manner and procedure by which a debtor may terminate its interests in a lease." The Debtor-Affiliates also contend, citing *Zota Petroleums, LLC*, 482 B.R. 154, *In re Samaritan Alliance, LLC*, 2007 WL 4162918 (Bankr. E.D.Ky. 2007), *In re Lee Road Partners, Ltd.*, 155 B.R. 55 (Bankr. E.D.N.Y. 1993), and *In re MMH Auto. Grp., LLC*, 385 B.R. 347 (Bankr. S.D.Fla. 2008), that "section 365 provides the sole avenue for transfer of property subject to a leasehold interest." A short discussion of each of the above cases puts the Debtor-Affiliates' arguments in proper context and, based upon the specific and unique facts of this case, the Court concludes that the sale to CH SP Acquisition, LLC was free and clear of any possessory interest stemming from the Pinnacle Restaurant Lease and the Opticom Lease.

Citing to *In re Lee Road Partners, Ltd.*, 155 B.R. 55 (Bankr. E.D.N.Y. 1993), the Debtor-Affiliates argue in paragraph 38 of their brief:

> Many courts have held that the majority interpretation is supported by the legislative history of section 365(h), which evidences a strong Congressional desire to protect lessees' interests in the face of a bankruptcy filing by their landlord. As one court stated:

> > In enacting § 365(h), Congress sought to codify a delicate balance between the rights of a debtor-lessor and the rights of its tenants, by preserving certain expectations of parties to real estate transactions. Specifically, Congress concluded that rejection of a lease by a debtor-lessor should not deprive a tenant of his estate for the term for which he bargained. H.R. Rep. No. 595, 95th Cong., 1st Sess. 349-350 (1977); S. Rep. No. 989, 95th cong., 2d Sess. 60 (1978), U.S. Code Cong. & Admin. News 1978, p. 5787. Furthermore, courts construing § 365(h) have

> concluded that the statute was designed to preserve a lessee's possessory
> interests in its leasehold while allowing a debtor-lessor to escape the
> burden of providing continuing services to a tenant . . . . In accordance
> with the Code's intent that a tenant not be deprived of his estate for the
> term for which he bargained, the lessee's leasehold estate cannot be
> diminished, changed or modified due to bankruptcy's intervention . . . . In
> short, § 365(h) seeks to prevent forcible evictions whenever possible.
> (citations omitted).

*See Lee Road Partners*, 155 B.R. at 60.

In *Lee Road Partners,* the debtor leased 100,000 square feet of its shopping center to

Woolworth.  Thereafter, the debtor granted Penn Insurance and Annuity Company ("PIA") a

mortgage on the premises.  Years later, Woolworth closed its store and subleased the premises to

three sublessees.  One of the sublessees then assigned its interest in one of the subleases to the

debtor.  In 1992, PIA commenced foreclosure proceedings against the debtor, and Woolworth

started an eviction action against the debtor.  Both matters were stayed when the debtor sought

bankruptcy protection.  In the bankruptcy proceeding, the debtor moved to reject Woolworth's

lease.

After discussing the legislative history of § 365, as quoted above by the Debtor-Affiliates,

the *Lee Road Partners* Court went on to discuss a case that involved a lease between related

entities, writing:  "While § 365(h)'s policy against forcible evictions is not contravened by

evicting an insider whose lease is bottomed on bad faith, the very essence of the statute would

dissipate were this Court to allow Woolworth, a legitimate lessee, to be ousted from the

premises." *Lee Road Partners,* 155 B.R. at 63.  The court also explained:

> This conclusion is to be distinguished from that of *Carlton Restaurant*, 151 B.R.
> at 353. In *Carlton*, a restaurant operator remained in possession of its leasehold
> pursuant to § 365(h) as its landlord had rejected the lease during its (the
> landlord's) bankruptcy. Subsequently, the tenant closed its restaurant and filed its

own bankruptcy petition. Since the lessee had closed its doors and did not intend to use the leasehold, the court reasoned that the policy against forcible evictions vanished. Thus, the court refused to allow the tenant to assume and assign the sublease.

*Id.*, n.18.

The Debtor-Affiliates also cite to *In re Taylor*, 198 B.R. 142, for the proposition that § 365 must be followed, consistent with the rules of statutory construction, and that § 365 provides the sole avenue for transfer of property subject to a leasehold interest. *Taylor* involved a debtor-lessor seeking to sell his assets free and clear under § 363(f)(3) and (4). The leases at issue were recorded and were arguably the result of arms-length transactions. Fifteen months after filing a voluntary Chapter 11 bankruptcy petition, the debtor sought and obtained authorization to secure a $11,250,000 loan. The proceeds of the loan were used to pay off the prepetition senior secured creditors. The postpetition lender was granted a first position mortgage on the debtor's property. The debtor-lessor subsequently moved to sell, prior to confirmation, substantially all his assets free and clear of the lessee's leasehold interests. The debtor received four bids for his properties; two contemplated a purchase of the debtor's properties free and clear of the lessee's interests, and two, including one by the lessee, contemplated purchasing the debtor's properties subject to the lessee's leasehold interests. The debtor indicated that if either of the latter two bids, which contemplated a purchase subject to the leasehold interests, were the successful bids, the debtor would withdraw his motion to sell. The lessee in *Taylor* opposed a sale free and clear of its leasehold interest for numerous reasons, including an argument that the debtor-lessor's exclusive remedies were under § 365. Prior to consideration of the sale motion, the court in *Taylor* had concluded that the leases were valid and enforceable.

Addressing the sale motion, the court in *Taylor* explained that in order for the debtor to sell his assets outside the ordinary course of business prior to confirmation, the sale would have to be consensual, or the debtor would have to show an emergency or a sound business reason to justify the preconfirmation sale.  As a threshold matter, the court in *Taylor* concluded that the debtor had "failed to meet the requirements of the sound business purpose test[.]" *Taylor*, 198 B.R. at 157.

The court proceeded to find that the requirements of § 363(f)(3) and (4) were not satisfied.  Finally, the *Taylor* Court concluded that § 365(h) was the debtor's exclusive remedy for addressing the leasehold interests because "specific legislation governs general legislation." *Taylor*, 198 B.R. at 164.  The court noted that the legislative history regarding § 365 "evinces a clear intent" that a "'tenant will not be deprived of his estate for the term for which be bargained" and that § 365(h) "effectively preserve[s] the expectations of the partes[.]"  *Id.* at 165.

The Debtor-Affiliates also rely on the holding of *In re Churchill Props. III, L.P.*, 197 B.R. at 288, wherein the Bankruptcy Court for the Northern District of Illinois held: ""[s]ince Congress decided [with the enactment of § 365(h)] that lessees have the option to remain in possession, it would make little sense to permit a general provision, such as Section 363(f), to override its purpose."  In that case, the lessee was not listed in the debtor's petition and only learned of the debtor's bankruptcy when the debtor sought to reject the lessee's lease.  The lease at issue was properly recorded and was arguably an arm's length agreement between unrelated parties.  The second position prepetition lender submitted a credit bid for the debtor's property, and took the property subject to the senior secured lender's claim.  The court in *Churchill Properties* did not  discuss whether any of the provisions of § 363(f)(1) - (5) were applicable.

28

For reasons similar to those stated in *Taylor*, after approval of the sale, the court in *Churchill Properties* granted a motion filed by the lessee, which allowed the lessee to continue operating its laundry concession in a 227 apartment complex, and permitted the lessee to retain its rights under § 365(h)(1)(A)(ii), reasoning "the recognition of Section 365 is more compelling and should rule the day." *Churchill Properties,* 197 B.R. at 287.

The Debtor-Affiliates' arguments are founded most heavily on *In re Haskell L.P.*, which deals with a debtor-lessor who sought to sell its assets free and clear under § 363(f)(5)[5] and a lessee seeking to exercise its rights under § 365(h).  The lease between the lessor and lessee was recorded in the county registry of deeds, the lessee had entered into a separate subordination agreement and nondisturbance agreement with the senior prepetition lender, and the amount owed to the senior prepetition lender exceeded the value of the property.  This Court also infers, given the absence of any indication to the contrary, that the lease agreement between the debtor-lessor and lessee was negotiated at arm's length.  The court in *Haskell* denied approval of the sale under § 363(f)(5) finding the debtor had failed to show under § 363(f)(5) that the lessee could be compelled to accept a monetary satisfaction for its interest in the property.  In particular, the court in *Haskell* found that the debtor had failed to rebut the lessee's evidence that its losses were incapable of calculation.  The court was also persuaded by the holdings of *Taylor* and *Churchill Properties* that if it granted the sale motion, it would eviscerate § 365(h), and that adequate protection could only be achieved through the lessee's continued possession of the leased premises.

The Debtor-Affiliates also rely on *In re Samaritan Alliance, LLC*.  Over two years prior

---

[5]  The debtor in *Haskell* was not seeking approval of the sale under § 363(f)(1)-(4).

to its bankruptcy, the debtor in *Samaritan Alliance* sold a property to Ventas Realty, LP

("Ventas") and then immediately leased the property back.  Samaritan then sub-leased the

property to Cardinal Hill Rehabilitation Unit at Samaritan Hospital ("Cardinal Hill").  Days prior

to its bankruptcy, the debtor, Ventas and the University of Kentucky entered into an agreement

that, in part, required that Samaritan give Cardinal Hill notice that its sublease was terminated.

Cardinal Hill alleged that such notice was never given.  Samaritan then filed its bankruptcy

petition, filed an emergency motion to sell substantially all its assets to the University of

Kentucky, and consistent with its prepetition agreement with Ventas and the University of

Kentucky, sought to reject the sublease agreement with Cardinal Hill.   The threshold issue for

determination in *Samaritan Alliance* was whether termination of the master lease between the

debtor and Ventas was voluntary, as argued by Cardinal Hill, or by operation of law, as argued by

the University of Kentucky.  Under the facts of the case, the court in *Samaritan Alliance*

concluded that the lease had not terminated by operation of law because it was allegedly in

default but rather, "was part of a more comprehensive plan, including the Debtors' bankruptcy

filing, that was formulated and agreed to by Ventas, the Debtors and [the University of

Kentucky]."  2007 WL 4162918, at *3.  Because the lease termination was part of that

agreement, the *Samaritan Alliance* Court concluded that § 365(h) was applicable.  The court in

*Samaritan Alliance* found the reasoning of *Haskell* instructive and concluded "that section 365(h)

is applicable in the context of a section 363(f) sale."  2007 WL 4162918, at *4.

   The Court will not recite the facts of *S. Motor Co. v. Carter-Pritchett-Hodges, Inc. (In re*

*MMH Auto. Grp., LLC)*, 385 B.R. 347, 363 (Bankr. S.D.Fla. 2008), other than to note that the

case involved an unrecorded billboard lease, not unlike the unrecorded Opticom Lease in this

case.  After addressing other issues, Judge Isicoff concluded in *MMH Automotive* that the trustee had the right to sell the debtors' property free and clear of liens and other interests under § 363(f)(5), and that the lessee was not entitled to possession under § 365(h), but rather, was entitled to its rights under § 363(e), or "the payment of the agreed upon value of its leasehold interest."  As aptly stated by Judge Isicoff, "MMH's bankruptcy did not confer any greater legal rights on CPH under the Billboard Lease or applicable non-bankruptcy law.  Section 365(h) preserves certain tenant rights; it does not enhance them."  385 B.R. at 366.

As discussed in *In re Zota Petroleums, LLC*, 482 B.R. at 160, the cases, which have found that "the § 365(h) rights of a tenant may be extinguished by a § 363 sale[,]" such as *Precision Industries*, "generally rel[ied] on two canons of statutory construction[:]"  (1) "that the court should afford a statute its plain meaning[;]" and (2) that courts should interpret statutes so as to 'avoid conflicts between them if such construction is possible and reasonable'"  In contrast, courts holding that a tenant's rights under § 365(h) may not be extinguished by a § 363 sale, such as *In re Haskell L.P.*, 321 B.R. 1, rely "in part upon the statutory construction principle that the more specific provision should prevail over the general[,]" and "also rely upon the legislative history of § 365(h) . . . [in which it is remarked that under § 365(h)] . . . a "'tenant will not be deprived of his estate for the term for which he bargained.'"  *Zota Petroleums*, 482 B.R. at 161.

After considering the foregoing and given the facts of this case, the Court finds that a case-by-case, fact-intensive, totality of the circumstances, approach, rather than a bright line rule, governs whether § 363(f) or § 365(h) prevails in any given situation.  In the case *sub judice,* the Debtor-Affiliates do not dispute that at least one provision of § 363(f) was satisfied.  The Debtor-Affiliates similarly do not dispute that the Trustee advanced good and sufficient business

justification for the sale or that CH SP Acquisition, LLC is entitled to the protections of a good faith purchaser under § 363(m), all as set forth in the Amended Sale Order entered June 13, 2013, at docket no. 599.

In addition to the foregoing undisputed facts, the Court finds:  (1) the leases between the Debtors and lessees were entered into at a time when all parties involved were controlled by James J. Dolan; (2) the Pinnacle Restaurant Lease provides for a lease rate that is far below fair market rental rates for the Big Sky area; and (3) the Opticom Lease, which has an initial term of 60 years, was unrecorded.  *See* MONT. CODE ANN. 70-21-304 ("Every conveyance of real property, other than a lease for a term not exceeding 1 year, is void against any subsequent purchaser or encumbrancer, including an assignee of a mortgage, lease, or other conditional estate, of the same property or any part thereof in good faith and for a valuable consideration whose conveyance is first duly recorded.").  CH SP Acquisition, LLC also presented evidence that the leases are in bona fide dispute, and they may be subject to closer scrutiny.  Furthermore, James J. Dolan and Pinnacle Restaurant at Big Sky, LLC have closed the doors at the Pinnacle Restaurant and have not operated at that location since April 2011.  Finally, the lessees in this case did not seek or obtain a subordination agreement or nondisturbance agreement from Citigroup, such as the lessee did in *Haskell*.

Notwithstanding the forgoing, the Debtor-Affiliates argue that the leases at issue predate the March 16, 2010, Amended and Restated Loan Agreement, wherein Citigroup, under paragraph 4.2(f), acknowledged and took subject to the Pinnacle Restaurant and Opticom Leases. Paragraph 4.2(f) of the Amended and Restated Loan Agreement reads as follows:

Section 4.2.  Representations and Warranties as to the Mortgaged Property.

32

Borrower hereby represents and warrants to Lender that, as of the Mortgaged Property and the Mortgage, as of the Restructuring Date:

(f)     Mortgage and Other Liens.  The Mortgage creates a valid and enforceable first priority Lien on the Mortgages Property described therein, as security for the repayment of the Indebtedness, subject only to the Permitted Encumbrances applicable to the Mortgaged Property. . .

The term "Permitted Encumbrances" is defined to include "rights of existing and future tenants and residents as tenants only pursuant to Leases."  The term "Leases" is defined to include "all leases, subleases, lettings, occupancy agreements, tenancies and licenses by Borrower as landlord of the Mortgaged Property or any part thereof now or hereafter entered into, and all amendments, extensions, renewals and guarantees thereof, and all security therefor." Amended Loan Agreement, p.17.

As stated in CH SP Acquisition, LLC's Motion, including leases as "Permitted Encumbrances" in the Amended Loan Agreement merely allowed the Debtors, as borrowers, to make representations to Citigroup with respect to the state of title to the mortgaged property so as to prevent the existence of a Permitted Encumbrance from causing a default under the Citigroup Loan.  The Debtor-Affiliates cite to nothing in the Amended Loan Agreement that would in any way change or elevate the priority of the lessees' interests over that of Citigroup or otherwise alter the priority scheme under Montana law, and nothing in section 4.2(f) of the Amended Loan Agreement suggests otherwise.  Indeed, in section 5.1(z)(ii) of the Amended Loan Agreement, the Debtors covenanted and agreed that "[a]ll Leases executed after the date hereof shall provide that they are subordinate to the Mortgage . . . ."  Amended Loan Agreement, p. 86.  The Original Loan agreement dated as of November 30, 2006, contained the same language regarding the

33

subordination of all leases to the mortgage.  Moreover, the Amended and Restated Loan Agreement specifically provided that the Original Loan Agreement would remain in full force and effect, and that the security interests made, granted or contemplated by the Original Loan Documents were in full force and effect and had been validly created and perfected.

As Judge Isicoff noted in *MMH Automotive*, § 365(h) preserves a tenant's rights, but does not enhance said rights.  The cases cited by the Debtor-Affiliates are in agreement that § 365(h) is intended to protect the term for which a lessee bargains.  In this case, the lessees, through James J. Dolan, were aware of the senior mortgage and if they wanted protection from an act, such as a foreclosure, they could have asked Citigroup for a subordination agreement or similar agreement.  No such agreement exists in this case.

The Debtor-Affiliates also argue that under the facts of this case, even if § 363(f) trumps § 365(h), that they are entitled to adequate protection under § 365(h).  The Debtor-Affiliates have provided no evidence that they will suffer any economic harm if their possessory interests are terminated.  In the absence of any request for adequate protection or allegation that some harm will result, the Court finds that any claim the Debtor-Affiliates may have for adequate protection pursuant to § 363(e) has not been established.

For the reasons discussed above, the Court will enter separate orders providing as follows:

IT IS ORDERED that the Trustee's Objection to Post-Hearing Reply Brief in Support of Objection of Boyne USA, Inc. and Big Sky Resort LLC to Trustee's Motion for Approval of Debtor-Affiliates Settlement and to Trustee's Proposed Allocation of Settlement Proceeds Among the Estates filed December 26, 2013, at docket no. 819 is sustained; and the Court will

34

not consider the Post-Hearing Reply Brief in Support of Objection of Boyne USA, Inc. and Big Sky Resort LLC to Trustee's Motion for Approval of Debtor-Affiliates Settlement and to Trustee's Proposed Allocation of Settlement Proceeds Among the Estates filed December 24, 2013, at docket no. 817.

IT IS FURTHER ORDERED that the Trustee's Motion for Approval of Debtor-Affiliates Settlement filed October 25, 2013, at docket no. 756, is granted; and the Debtor-Affiliates Settlement attached thereto is approved, but approval of such settlement does not effect any independent claims that other parties, who are not parties to the Debtor-Affiliates Settlement, may have against any of the Debtor-Affiliates.

IT IS FURTHER ORDERED that CH SP Acquisition, LLC's Motion for Determination that the Debtors' Assets are Sold Free of Insider Leases filed September 27, 2013, at docket no. 727, is granted; and the sale of substantially all the Debtors' assets to CH SP Acquisition, LLC was free and clear of the Insider Leases and the Debtor-Affiliates' possessory interests under the Insider Leases; and the Debtor-Affiliates, their respective officers, agents and employees who have access to and control over any portion of the Assets shall cease exercising control over any portion of the Assets and are hereby enjoined from exercising control over any portion of the Assets and from interfering with CH SP Acquisition, LLC's use, peaceful enjoyment and control over the Assets.

BY THE COURT

HON. RALPH B. KIRSCHER
U.S. Bankruptcy Judge
United States Bankruptcy Court
District of Montana

35